1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2                Newport News Division

3

4   - - - - - - - - - - - - - - - - - -
                                    )
5   UNITED STATES OF AMERICA,       )
                                    )
6   v.                              )   CRIMINAL ACTION NO.
                                    )   4:22cr92
7   GEORGE WILLIAM EVANS,           )
                                    )
8                                   )
            Defendant.              )
9   - - - - - - - - - - - - - - - - - -

10

11

12              TRANSCRIPT OF PROCEEDINGS
                     **(Sentencing)**
13        **(Redacted by order of the Court)**

14                Norfolk, Virginia

15                August 3, 2023

16

17  BEFORE:  THE HONORABLE ELIZABETH W. HANES
            United States District Judge

18

19

20  APPEARANCES:

21          UNITED STATES ATTORNEY'S OFFICE
            By:  Brian James Samuels
22               David M. Coleman
                 Assistant United States Attorneys
23               Counsel for the United States

24          WEISBERG & WEISBERG, PLLC
            By:  Noah David Weisberg
25               George Gorman
                 Counsel for the Defendant

```
 1                        I N D E X

 2    GOVERNMENT'S
      WITNESSES                                    PAGE
 3
        (None)
 4

 5
      DEFENDANT'S
 6    WITNESSES                                    PAGE

 7      ERIN EVANS
             Direct Examination By Mr. Weisberg      9
 8      HAYLEY EVANS
             Direct Examination By Mr. Weisberg     11
 9      MELISSA EVANS
             Direct Examination By Mr. Weisberg     14
10

11

12                     E X H I B I T S

13    GOVERNMENT'S
14    NO.                                          PAGE

15      (None)

16
      DEFENDANT'S
17    NO.                                          PAGE

18      (None)

19

20

21

22

23

24

25
```

JILL H. TRAIL, Official Court Reporter

```
 1              (Proceedings commenced at 10:40 a.m.)

 2              THE COURT:  Good morning.

 3              MR. SAMUELS:  Good morning, Judge.

 4              THE COURT:  Madam Clerk, can you call our next

 5    matter, please.

 6              THE CLERK:  Criminal number 4:22cr92, United States

 7    of America versus George Evans.

 8              Mr. Samuels, is the government ready to proceed?

 9              MR. SAMUELS:  The government is ready.  Good

10    morning, Your Honor.

11              THE COURT:  Good morning.

12              THE CLERK:  Mr. Weisberg, is the defendant ready to

13    proceed?

14              MR. WEISBERG:  The defendant is ready.  Good

15    morning.

16              THE COURT:  Good morning, Mr. Weisberg.

17              Good morning to you, Mr. Evans.

18              THE DEFENDANT:  Good morning.

19              THE COURT:  Nice to see you, sir.

20              You all can just come forward.

21              Before we get started, let me just first apologize

22    for starting court later than scheduled.  We generally do

23    try to stay on schedule, so I'm sorry to keep everyone

24    waiting.

25              Mr. Evans, you had previously appeared before me
```

1    and entered a plea of guilty to Count One, which charges

2    conspiracy to defraud and commit offenses against the United

3    States, in violation of 18, United States Code, Section 371;

4    and Count Thirty-One, which charges engaging in monetary

5    transactions in criminally derived property, in violation of

6    18, United States Code, Sections 1975 and 2.  And so this

7    hearing is set this morning for your sentencing in which I

8    will consider and then impose the sentence in your case.

9            Do you understand that, sir?

10           THE DEFENDANT:  Yes, Your Honor, I do.

11           THE COURT:  All right.

12           Let me first ask the Government, have all known

13    victims been provided notice of this hearing and an

14    opportunity to be heard?

15           MR. SAMUELS:  Yes, Your Honor, they have.

16           THE COURT:  Thank you.

17           So, in preparation for the sentencing today, the

18    Court received and reviewed your Presentence Report, which

19    is the report that the probation officer prepared in your

20    case.  The most recent of that report was filed on June 5th,

21    and the addendum indicates that there are no unresolved

22    objections to the report.

23           So, let me first ask you, Mr. Weisberg, did you

24    have a sufficient opportunity to review the Presentence

25    Report with Mr. Evans prior to appearing before me today?

1          MR. WEISBERG:  I did, Your Honor.

2          THE COURT:  Do you know of any other addictions,

3   corrections, or modifications that need to be made?

4          MR. WEISBERG:  I do not, Your Honor.

5          THE COURT:  Now, I do have the letters that you've

6   submitted as attached to your sentencing position, but do

7   you have any other evidence that you would like to present

8   today?

9          MR. WEISBERG:  Just from the witnesses who provided

10  those letters, brief testimony, Your Honor.

11          THE COURT:  Okay.  Very well.

12          And then finally, have you reviewed the mandatory,

13  standard, and special conditions of supervised release,

14  which also include conditions of probation that are included

15  in the Presentence Report?

16          MR. WEISBERG:  We have, Your Honor.

17          THE COURT:  All right.

18          So, Mr. Evans, I do have some questions for you.

19          The reason we focus so heavily on the Presentence

20  Report is, in addition to the parties' arguments, it really

21  is the fundamental information that I receive and consider

22  in trying to determine the appropriate sentence in your

23  case.  So it's very important that the information in the

24  Presentence Report is accurate and complete because of its

25  role in the sentencing process.

1          So I want to ensure, sir, did you have enough time
2  to review the report and go through it with your attorney?
3          THE DEFENDANT:  Yes, Your Honor, I did.
4          THE COURT:  And do you think there are any errors
5  in the report?
6          THE DEFENDANT:  I think any errors that may have
7  been there were corrected with the reviews that we did.
8          THE COURT:  Very well.
9          And do you also believe that the report is
10  complete?  Does it have everything in it that you think it
11  should have about you for purposes of sentencing?
12          THE DEFENDANT:  Yes, Your Honor, I do.
13          THE COURT:  All right.  Now, at the end of this
14  Presentence Report is a list of conditions of supervised
15  release and probation.  Both of those are simply periods of
16  supervision which come with conditions, things that you can
17  and cannot do.  If you violate those conditions, you could
18  face an additional term of incarceration.  So it's important
19  that you read them, understood them.  When I impose
20  sentence, I won't necessarily go through each one, so long
21  as you have read them already as they're set forth in the
22  Presentence Report.
23          So, Mr. Evans, did you read and review and talk
24  with your attorney about the mandatory, standard, and
25  special conditions in the Presentence Report?

1          THE DEFENDANT:  Yes, Your Honor, I did.

2          THE COURT:  Do you have any questions?

3          THE DEFENDANT:  No, I do not.

4          THE COURT:  All right.  Do you need any additional

5    time before we go forward with your sentencing, Mr. Evans?

6          THE DEFENDANT:  No.  No, Your Honor, I don't.

7          THE COURT:  All right.  So, for purposes of the

8    record I am going to set forth the maximum penalties that

9    are set by statute and then review the advisory guideline

10   range.

11         As to Count One, the maximum penalties are:  A

12   maximum term of five years of incarceration, a fine of

13   $250,000 or twice the gross gain or loss, restitution,

14   forfeiture of assets, a $100 special assessment per count,

15   for a total of $200, and a maximum term of three years of

16   supervised release.

17         As to Count Thirty-One, the maximum penalties are:

18   A ten-year term of incarceration, a fine, the same fine,

19   which is $250,000 or twice the value of the monetary

20   instruments or funds involved, restitution, forfeiture, a

21   $100 special assessment per count, and a maximum term of

22   three years of supervised release.

23         The Presentence Report also calculates your

24   advisory guideline range.  That is a range of months that's

25   calculated by looking at the offense and your criminal

1    history.  Here, you have almost no criminal history, and,

2    therefore, you're a Criminal History Category I.  The total

3    offense level is calculated at a total offense of 26, and

4    that yields an advisory guideline range of 63 to 78 months

5    for Counts One and Thirty-One.

6           And also, I'll just set forth also the recommended

7    fine is $25,000 to 3,000,000, just over $3,000,000.

8           Mr. Weisberg, do you agree that those are all

9    properly calculated?

10          MR. WEISBERG:  Yes, we do, Your Honor.

11          THE COURT:  All right.  You all can, then, step

12   back and I'll talk to the government next.

13          Mr. Samuels, I think we should hear the evidence,

14   but I'll just address a couple of things with you first and

15   then we'll hear evidence.

16          MR. SAMUELS:  Yes, Your Honor.

17          THE COURT:  Do you know of any other additions,

18   corrections, or objections that need to be addressed this

19   morning?

20          MR. SAMUELS:  I do not, Your Honor.  Thank you.

21          THE COURT:  And you moved for a one-point reduction

22   for acceptance of responsibility.  That motion is granted.

23   It's already reflected in the advisory guideline range.

24          Do you agree that that range is properly

25   calculated?

Evans, E. - Direct                                                          9

```
 1              MR. SAMUELS:  I do, Your Honor.

 2              THE COURT:  And do you have any evidence to

 3   present?

 4              MR. SAMUELS:  We do not, Your Honor, other than the

 5   materials that were attached to our position paper, which we

 6   would ask the Court to incorporate and consider.

 7              THE COURT:  I will.

 8              MR. SAMUELS:  Thank you.

 9              THE COURT:  Thank you all.

10              MR. SAMUELS:  Thank you, Judge.

11              THE COURT:  Mr. Weisberg, do you want to call any

12   witnesses --

13              MR. WEISBERG:  Yes, Your Honor.

14              THE COURT:  -- you want to call?

15              MR. WEISBERG:  Yes.  May I call Erin Evans, please,

16   Your Honor?

17              (The witness was administered the oath.)

18              THE COURT:  Mr. Weisberg, you can go ahead when

19   you're ready.

20              MR. WEISBERG:  Thank you.

21              ERIN EVANS, called by the Defendant, having been

22   first duly sworn, was examined and testified as follows:

23                          DIRECT EXAMINATION

24   BY MR. WEISBERG:

25   Q.  Ma'am, would you introduce yourself to Her Honor, please.
```

Evans, E. - Direct                                                    10

1    A.  I am Erin Evans.

2    Q.  And what's your relationship to my client?

3    A.  I'm his daughter.

4    Q.  Ms. Evans, you have provided the Court a character

5    letter, essentially, that the Court has before it, correct?

6    A.  Yes.

7    Q.  All right.  And, Ms. Evans, what, if anything, other than

8    what's contained in that letter, do you want the Court to

9    know about your father today?

10   A.  I -- I will say that I have really seen a difference in

11   him since -- since the laundry business was sold.  It kind of

12   was a -- like a weight off of his shoulders.  And he just, I

13   can tell -- like, I could tell that there were periods of

14   depression that he probably wouldn't admit to, but I can see

15   that he's happier now.  And, you know, even with this

16   sentencing looming over him, he's just a different, happier,

17   better person.

18   Q.  Do you think that he is in any way, other than, of

19   course, what, you know, has been established in this

20   courtroom and otherwise in terms of monetary damages, have

21   you witnessed anything that makes you believe that he has

22   suffered at all, any degree of remorse at all?

23   A.  Yeah.  He is -- there have been many conversations where

24   he has teared up with me, just feeling guilt for what he has

25   put our family through and what he put anybody else through,

Evans, H. - Direct                                                    11

1   and just shame that, you know, he got to that point.

2   Q.  What he did in this case, is that, in your mind,

3   consistent with the father that you knew all of the years

4   prior to him getting involved in Magnolia laundering?

5   A.  Not at all.  It was incredibly shocking.

6   Q.  Okay.

7          MR. WEISBERG:  Thank you.  I have no further

8   questions.

9          THE COURT:  All right.

10          Ma'am, hold on one second.  I just need to ask the

11   government if they want to ask any questions.

12          Do you have any questions?

13          MR. COLEMAN:  No questions, Your Honor.

14          THE COURT:  All right.

15          Ma'am, thank you for your testimony.  You may stand

16   down now.

17          MR. WEISBERG:  Hayley Evans, Your Honor.

18          THE COURT:  All right.

19          (The witness was administered the oath.)

20          THE COURT:  Go ahead.

21          HAYLEY EVANS, called by the Defendant, having been

22   first duly sworn, was examined and testified as follows:

23                          DIRECT EXAMINATION

24   BY MR. WEISBERG:

25   Q.  You are Miss Hayley Evans?

Evans, H. - Direct                                                    12

1    A.  Correct.  Yes.

2    Q.  And you are, of course, Mr. Evans, the defendant's

3    daughter?

4    A.  Yes.  That's correct.

5    Q.  You are the same Hayley Evans that filed a character

6    letter that has been provided to the Court and filed?

7    A.  Yes.  Correct.

8    Q.  All right.  Ms. Evans, can you tell the Court anything

9    you want the Court to know about your father that you haven't

10   included in that letter, that you want Her Honor to know

11   about?

12   A.  Yeah, absolutely.

13           Good morning, Your Honor, and thank you for your

14   time this morning.

15           To kind of elaborate a little bit more on what I

16   talked about in my letter, my dad started coming to church

17   with me in April, the first Sunday that he was available

18   after he sold the business.  That was something that was very

19   important to him.  And I've seen him immediately join, to

20   start volunteering and getting to know people, and started

21   seeing one of our pastors for counseling, so I have truly

22   seen him be super remorseful.

23           I know one point that I kind of touched on in my

24   letter is my dad's meticulousness for following the rules and

25   the laws.  And his first Sunday serving with the parking lot

Evans, H. - Direct                                                    13

1   team, so helping make sure that families get safely into the

2   church, the leader of that team asked him to meet at, like,

3   10:05.  And I noticed my dad looking at his watch at, like,

4   9:58.  And he was walking to a room like right next door, and

5   he was like, "I should probably go so I can make it there in

6   time to help them out."  And that's very consistent with the

7   way I've always seen my dad and just like his meticulousness

8   for order and doing the right thing and making sure that the

9   people who rely on him are getting the best of him.

10          And, yeah, I've seen him show a lot of remorse the

11  past few months, almost every time we talk.  It is very

12  emotional for him.

13          This past Sunday, you know, being his last week

14  before today's hearing, he -- his chin just kept quivering

15  every time he talked to someone just -- and not in a feeling

16  sorry for himself kind of way but just -- just the

17  anticipating what was to come this week, so that's -- that's

18  kind of what I've been observing of my father the past few

19  months.

20          MR. WEISBERG:  Thank you.

21          I have no further questions, Your Honor.

22          THE COURT:  All right.  Ms. Evans, hold on one

23  second.

24          Do you have any questions?

25          MR. COLEMAN:  No, Your Honor.

Evans, M.  - Direct                                              14

1            THE COURT:  All right.  Thank you, ma'am, for your

2    testimony.  You may stand down.

3            THE WITNESS:  You're welcome.  Thank you.

4            MR. WEISBERG:  Our final witness will be Melissa

5    Evans, Your Honor.

6            (The witness was administered the oath.)

7            MELISSA EVANS, called by the Defendant, having been

8    first duly sworn, was examined and testified as follows:

9                        DIRECT EXAMINATION

10   BY MR. WEISBERG:

11   Q.  Ms. Evans, you're, of course, Melissa Evans, who provided

12   a letter to the Court regarding your father's character?

13   A.  Yes.  That's correct.

14   Q.  And, Ms. Evans, if you could describe to the Court what,

15   if anything, you want the Court to know about your father

16   today that you haven't already provided in that letter.

17   A.  In addition to the letter that I provided, I mean,

18   ultimately, I just want to emphasize how -- how good of a man

19   he is, and he has always been, and what I've seen.  He's been

20   very fair, and he taught me to be fair and caring, and that

21   is definitely the character I have seen with him very

22   consistently.  I --

23   Q.  I'm sorry.  Go ahead.

24   A.  No, that's okay.

25            I have -- just like my sister said -- have also seen

JILL H. TRAIL, Official Court Reporter

1    a change in him since he sold the laundry and definitely a

2    remorse.  I mean, I think all three of us girls have had

3    similar conversations with him where, you know, he's sad and

4    remorseful and just relieved that the laundry is sold but

5    still, you know, sad at the situation.

6    Q.  Your father before Magnolia was with LandAmerica, you're

7    aware of that?  That's the evidence in the case, yes?

8    A.  Yes.

9    Q.  Okay.  Now, when you think back to your father at that

10   time period versus how he was in his time with Magnolia, how

11   would you describe that comparison?

12   A.  Well, my dad is very hardworking, no matter what.  He was

13   a very hardworking man at LandAmerica, and he was very

14   hardworking at the laundry, mostly being -- you know, making

15   sure that he put his efforts in to keep as much of the

16   business afloat as he could because, you know, there were

17   things that had to be done to keep the business afloat, but I

18   saw him work harder than ever doing that.

19   Q.  Do you think it impacted -- did you see it impact him in

20   terms of energy levels, exhaustion, judgment, or anything

21   like that?

22   A.  Yes.  He was definitely exhausted.  I mean, he was

23   working ungodly hours and, you know, only getting enough

24   sleep to -- I mean, honestly, not even getting enough sleep

25   but just, you know, getting some sleep to be able to get up

1    again the next morning and do it over again.

2    Q.  Did it have any impact to you and your relationship with

3    him, the amount of time that he was working at Magnolia?

4    A.  Yes.  I felt like some time was robbed from me.

5    Q.  Was robbed, is that what you said?

6    A.  Yes.

7    Q.  Okay.  When we talk about his remorse, do you have a way

8    to sort of describe that?  Is this a remorse of somebody who

9    is upset that they got caught, or is it remorse of somebody

10   who is upset at what they did?  Can you articulate on that

11   front?

12   A.  Yes.  Not just upset that he got caught, but -- I mean,

13   my dad has always been a good person, and he preaches the

14   right thing.  He made sure all three of us girls knew that.

15   So I think that it's real remorse.

16   Q.  He regrets the nature of his decisions?

17   A.  Absolutely.  I don't -- I don't think that this would

18   have been something he would have chose to do other -- like,

19   if he didn't feel like he didn't have to maybe.

20   Q.  And you know if he is sentenced to a period of

21   incarceration and, you know, if he is granted an opportunity

22   to surrender at a future date, if that is necessary, are you

23   going to be there to support him and help him facilitate his

24   obligations to the United States government?

25   A.  Yes.

1  Q.  And then after that, are you still going to be there to

2  help him if he is eventually released?

3  A.  Yes.

4            MR. WEISBERG:  Thank you.  No further questions.

5            THE COURT:  Thank you.

6            Government?

7            MR. COLEMAN:  No questions, Your Honor.

8            THE COURT:  All right.

9            Thank you, Ms. Evans.  You can step down.

10            THE WITNESS:  Thank you.

11            MR. WEISBERG:  Your Honor, that is the nature of

12  our testimonial evidence.  We would just ask the pre-filings

13  that have been already brought into the court be made a part

14  of the record.

15            THE COURT:  They will be.

16            MR. WEISBERG:  Thank you.

17            THE COURT:  Thank you.

18            All right.  I'll hear from the government.

19            MR. SAMUELS:  Thank you, Your Honor.

20            Your Honor, in listening to Mr. Evans's daughters

21  there, I was gratified to hear the expressions of remorse

22  because in some of the position papers that have been filed,

23  I had some concerns about that, so I was glad to hear that.

24            And I know the defendant's daughters are referring,

25  of course, to his whole background that the Court must

1    consider, and so I would also ask the Court to consider in

2    the serious offense of this case the entire nature of the

3    offense.  And I am going to talk about Mr. Evans's

4    involvement specifically, but the entire nature of the case

5    I think warrants consideration, just like Mr. Evans's

6    background does.

7              THE COURT:  Mr. Samuels, will you move the

8    microphone closer to you?

9              MR. SAMUELS:  Oh, so it's louder?  Okay.  I don't

10   usually have that problem.  Yes, Your Honor.

11             THE COURT:  It's not too bad, but go ahead.

12             MR. SAMUELS:  Yes, ma'am.

13             This is a labor trafficking conspiracy that

14   Mr. Evans comes to the Court to be sentenced on.  It was a

15   conspiracy that lasted for a relatively long period of time,

16   from 2017 through 2022, and Mr. Evans did play a role in

17   this.

18             It was not just a case of hiring undocumented

19   workers to work at the Magnolia laundry facility.  And the

20   workers, really the victims in this case, Your Honor, many

21   of them did come from Central America, largely El Salvador.

22   So there is an immigration component to it, but there is a

23   larger component about exploitation, about control of

24   the vulnerable workers for profit, not just about hiring

25   undocumented individuals, or not being aware of the hiring

1    requirements.  That would dilute, really, the nature of this

2    case.  And that's important because the more serious the

3    case, it does elevate an individual's connection to it and

4    sentencing exposure when the case is more serious.  So we

5    would ask you to consider the entire nature of the case.

6          Now, Your Honor, this case involved labor

7    trafficking.  In 2000, the Trafficking Victims Protection

8    Act defined labor trafficking as "The recruitment,

9    harboring, transportation, provision, or obtaining of a

10   person for labor or services, through the use of force,

11   fraud, or coercion for the purpose of subjection to

12   involuntary servitude, peonage, debt bondage, or slavery."

13         And so some of the components of that, Your Honor,

14   are fear of physical harm to the worker or their family, a

15   fear of deportation, coercive debt payments, and essentially

16   victims not being able to make their life choices as to

17   where they are going to live, when they are going to work,

18   when they can leave.

19         This case really does have all of these attributes

20   to it.  It's often an underreported crime because of the

21   nature of the victims.

22         And again, Your Honor, I am going to talk

23   specifically about Mr. Evans's involvement, but I do want to

24   set the stage for the Court as to the nature of the entire

25   case.

1          It also, of course, involves a money laundering
2     component.  And specifically with respect to Mr. Evans, in
3     August of 2019, he made a transfer of funds derived from the
4     specified unlawful activities of inducing entry, harboring,
5     transporting, all trafficking-related offenses, Your Honor.
6     The overall amount of the money laundering was about
7     1.5 million.  That's not really captured in the guidelines
8     in the way they're calculated in this case, but it's
9     something that's important because it shows and
10    demonstrates:  Number one, the profit motive to this; and
11    number two, how the proceeds from this were kind of plowed
12    right back into it to keep it going again.
13         So, Your Honor, as we've set forth in our position
14    paper, when we look at the nature and circumstances of the
15    offense, the leadership role that the defendant played as an
16    owner of the business, who did manage it, and this profit
17    motive, we submit that this supports an advisory sentence at
18    the lower end of the range for Mr. Evans.  And then we do
19    have a separate variance motion that I'll talk about at
20    another time, at the appropriate juncture.
21         But, again, looking to the nature and circumstances
22    of the offense, from 2017 through 2022, the defendant was a
23    co-owner of Northstar, which operated as Magnolia, this
24    laundry business in Williamsburg that had actually been
25    operating since 2009.  And in these later years, in this

1    time period we're focused on, it really came to rely upon

2    this traffic-enforced labor, in violation of a number of

3    U.S. laws as well as the dignity of the victims.  And on the

4    defendant, he was an owner.  He was a manager.  He was a

5    director.  He was a shift supervisor.  He played a role

6    here, and he is responsible for his participation.  Judge,

7    there were many steps to this over a long period of time

8    that are well-summarized in the, I think nearly hundred

9    paragraphs of the PSR.

10           Certainly, Magnolia came to a point where they

11   needed a supply of workers to service the many contracts

12   that they had, the commercial laundry business in

13   Williamsburg with all of the resorts that are there.  So

14   these workers had to be identified.  They were largely

15   vulnerable people from Central America, again, from El

16   Salvador.

17           There had to be an engagement of transportation

18   from Central America, payments to individuals who largely

19   smuggled these workers to the United States.  Some

20   encountered Border Patrol, some did not.  Some served time

21   in detention facilities.  One I believe was smuggled in the

22   trunk of a car from Mexico to Houston.  They were then

23   transported to Williamsburg.

24           The workers were housed in Williamsburg, some of

25   them at the homes of co-defendants, Mr. Vaughan and

1   Ms. Landaverde.  And some of the workers were actually
2   housed in the laundry facility.
3            Fraudulent identification documents had to be
4   obtained to make them appear to be legitimate.
5            And then this scheme kind of turned on itself where
6   the conspirators collected payments from the workers, and
7   they collected payments to pay for their travel to the
8   United States, sometimes payments just to live in the
9   warehouse in some poor conditions.
10           As the PSR references, G.M.M.M. paid some -- was
11   asked to pay some $22,000 for their transport to the United
12   States, even though they believed it was far less and only
13   cost about $12,000.  F.A.P.C.E. paid some $28,000, was asked
14   to pay that amount.  And then money was given back to these
15   same workers to structure payments back to the smugglers to
16   keep this ring going.
17           And then there was an effort, Your Honor, to keep
18   the workers in line, and that was done through debts,
19   through threats, through physical abuse.
20           What nature did the threats take?  We had, I think,
21   I believe at least eight victims identify some of these:
22   Threats to deport them, threats to prosecute, hitting them
23   for making friends -- the young minor who went to school in
24   Williamsburg -- threats to harm them or their family members
25   in order to make them to stay and to work.

1          So the upshot of all of this, Your Honor, was a

2    workforce that was in fear but was controlled, who worked

3    long hours.  Money came through to these owners through the

4    control and this exploitation.

5          And the Presentence Report recounts some pretty

6    startling examples.  Some of those are referenced in the

7    Victim Impact Statements.

8          There was a young minor, M.G.M., 13-years old when

9    she came here, was in the detention center for a period of

10   time and then traveled to Williamsburg.  She not only worked

11   but went to school, and it was this back and forth between

12   going to school during the day, school in Williamsburg, and

13   then being picked up and taken to work all night, back and

14   forth, school and work, over and over again, couldn't make

15   friends, was threatened if she did so.

16         V.M.G. and her infant son were brought up in August

17   of 2021.  They were living in the business.  And I believe

18   we attached a photograph to our position paper that

19   indicated that this child was in a stroller with the bottle

20   attached to a strap attached to the stroller.  The child was

21   unaccompanied for times when the mother was working.  The

22   business was certainly not suitable for an adult to be

23   living in as an adult, not to mention a young child.

24         Workers came in at the end of this time period

25   paying double their costs of transport.

1         And I will make the point to Your Honor that this

2    crime did not stop on its own.  No one raised their hand and

3    said, "We need to stop this conduct.  This is wrong."  It

4    only stopped because HSI, the Department of Labor did their

5    investigation, engaged in search warrants and arrest

6    warrants.  That's what stopped this, not any of the

7    defendants saying, "We know this is wrong.  We need to stop

8    it."

9         Now, let's look at what the defendant knew and what

10   the defendant did, because I think the Court has to consider

11   this as well.  When we briefed this matter, we certainly

12   acknowledged then, and we acknowledge today that the

13   defendant played a lesser role here individually, although

14   he was certainly part of the conspiracy, and we did credit

15   the defendant that lesser role in our guideline

16   recommendation.

17        I'm somewhat concerned, Your Honor, with how the

18   case was cast in some of the recent defense pleadings, but I

19   understand that the defense does acknowledge that he was

20   aware and involved in this from as far back as 2017.  But

21   this isn't just a technical guilt, Your Honor.  This isn't a

22   regulatory crime.

23        So looking at what the defendant admitted to in the

24   statement of facts and the PSR that sort of serves as our

25   template here, he certainly admitted he was a manager.  He

1    admitted he was an owner and director, responsible for

2    hiring.  He made payments to these workers that he knew were

3    not authorized to work in the United States.  And the

4    Presentence Report recounts at least 25 separate documented

5    payments from 2017 through 2021 to many different workers.

6            In 2019 through 2022, the defendant, along with

7    conspirators, provided these workers with currency to wire

8    to Central America, and there were some $200,000 sent to

9    Central America.  This is proceeds from the business.

10            In 2021, he acknowledged that he knew that a young

11    worker was housed there and her child at the business.

12            In 2022, Your Honor, there was a recorded phone

13    call with the defendant.  And this recorded phone call, Your

14    Honor, I submit, reveals that the defendant was aware of

15    some of the various red flags that were occurring here at

16    the business.  And he's talking with these individuals

17    telling them, I don't do a background check, or anything

18    based on that, and that he's certain that they have had

19    people with false papers.  Then this undercover individual

20    met with the defendant and Ms. Landaverde and asked for a

21    way to get documents.

22            So, Your Honor, there were a lot of red flags here

23    from the defendant's involvement in the business.  He wasn't

24    an absentee landlord.  He was a shift supervisor.  We have

25    heard that he worked long hours at the business, where these

1   other victims and workers also worked long hours.

2          I believe in our position paper we referenced a

3   worker that identified that she worked some 160 hours in the

4   course of two weeks, very long hours under very, very

5   difficult conditions.

6          THE COURT:  He was the day shift manager?

7          MR. SAMUELS:  I believe that's correct, Your Honor.

8          The defendant certainly was in a position as a

9   co-owner where he could have stopped this, but he didn't.

10  And I understand, Your Honor, that there are cases when an

11  individual is in a pot of water and that pot gets hotter and

12  hotter and hotter, and you just find yourself involved in

13  something, but at some point -- and I think defense would

14  acknowledge that by at least 2017 -- the defendant knew that

15  these things were going on and that this is how they were

16  providing their workforce.  We would expect somebody like

17  the defendant to pull the plug on this, but he didn't.

18         When arrested, he did not cooperate initially,

19  didn't talk with law enforcement.

20         In the Presentence Report, he made a claim in his

21  acceptance of responsibility portion that this stemmed from

22  COVID, but, Your Honor, all of the payments and a lot of the

23  facts in this case occurred well before 2020, so I find that

24  somewhat hard to credit.

25         In terms of the defendant's knowledge, again, what

1   we can show is that he was a 50 percent owner of the

2   business.  He was local, present and engaged, shift

3   supervisor, knows that the workers are working, knows there

4   is a minor there and a woman with her infant son.

5           Many of the threats that occurred here, Your

6   Honor -- and we're not attributing the defendant with the

7   threats, but many of the threats occurred at the warehouse,

8   Your Honor.  And it would just seem that there is almost too

9   much that occurred at the business or in connection with his

10  finances for him to just turn a blind eye to this, as to

11  what was going on.

12          The total amount of laundered funds, one and a half

13  million, 215,000 of which were these international wires.

14  And the total funds that are subject to forfeiture from the

15  proceeds of this were 3.9 million to the conspirators, and

16  that's based on a percentage of the workforce over the time

17  period.  But, Your Honor, again, it's enough red flags that

18  should have caused the defendant to be able to issue spot

19  this.  He's educated.  He's experienced.  These things were

20  going on right under his nose.

21          And further looking at the conspiracy he pled to,

22  the driving charge of this multi-object conspiracy, and all

23  of the objects of the conspiracy relate either to

24  essentially trafficking -- it's bringing the immigrants into

25  the United States, transporting them to avoid detection,

```
1    harboring them, producing false identification documents
2    that were necessary for them to work at Magnolia -- and then
3    there is the obtaining labor by force piece that the
4    defendant is not as involved with.
5              But, Your Honor, conspiracies are separate crimes
6    beyond the substantive crimes, because they present separate
7    dangers of criminality.  There are special group dangers of
8    criminality when you have multiple individuals involved, and
9    that's really for a couple of reasons.  There is a better
10   chance at concealment due to the compartmentalization that
11   occurs.  One conspirator takes one task, another another.
12   There is a better chance of success.  The whole tends to be
13   greater than the sum of the parts.
14             And the defendant was involved in this conspiracy,
15   and he can't set aside what was done completely by these
16   other conspirators because he benefited from it.  He was the
17   owner of the business.
18             And it does seem to me that in his position papers
19   he has somewhat narrowed or minimized the view he has of the
20   offense.  I hope I am reading that wrong.  I hope that he
21   really does have remorse for this and realizes the scope of
22   this.
23             THE COURT:  Let me ask you -- I just want to make
24   sure I confirm your position on one thing.
25             MR. SAMUELS:  Yes, Your Honor.
```

1         THE COURT:  Regarding the physical threats and the

2    force and the debts -- well, actually let me just start with

3    the threats and the physical abuse.  I think the parties are

4    in agreement that Mr. Evans did not personally engage in

5    that conduct and did not direct that conduct.

6         MR. SAMUELS:  That's correct, Your Honor.  We have

7    no evidence of that.

8         THE COURT:  But it seems that there is some dispute

9    about the degree of his knowledge of whether those

10   activities were occurring.

11        MR. SAMUELS:  I think there is, yes.  And, Your

12   Honor, it's knowledge, so we can't open his head and see

13   what he actually knew, but I think, again, there were enough

14   red flags and enough issues going on there that perhaps he

15   just really had serious blinders on, but having serious

16   blinders on isn't itself a way to avoid knowledge, when

17   you're trying to ignore what's obvious, when you're trying

18   to put your head in the sand, and this was operating for

19   such a long period of time, and he was directly involved,

20   and admitted being involved in the hiring of individuals.

21        THE COURT:  What about the payment of debts, so the

22   rent payments, repayments for the transport, what was his

23   involvement as to that?

24        MR. SAMUELS:  We don't have any direct evidence

25   that he was involved in those payments of debt, Your Honor.

```
1   But he has admitted that he, along with the other
2   conspirators, did provide some money for these workers to
3   send down to others, and I believe he would readily admit
4   that he did that directly in a period of time, that he sent
5   money to bring people back into the United States as the
6   scheme continued, as it grew more serious.
7           THE COURT:  All right.
8           MR. SAMUELS:  Your Honor, the guideline range,
9   recognizing it is advisory, is 63 to 78 months.  In the
10  government's view that reflects the seriousness of the
11  offense as a whole, it does.
12          Mr. Evans is given a two-level leadership
13  enhancement.  There is an enhancement for the number of
14  individuals that are trafficked.  We believe that that is a
15  conservative but appropriate number of 25 to 99.  There were
16  at least that many over that five-year period.  There is
17  enhancements for the unaccompanied minor and vulnerable
18  victim.  And then Mr. Evans also pled guilty to the money
19  laundering.
20          So in the government's view, this does recognize
21  the facets of the case.  This scheme really only operates if
22  the profits from it can be channeled back in, and certainly
23  the defendant played a role in that.
24          But 1.5 million doesn't really have any recognition
25  in the guidelines.  There is -- normally 1.5 million, if
```

1    that's the amount that's laundered, that results in its own

2    sentence that's about this level, but because it defaults

3    to, really, the immigration guidelines, it doesn't look that

4    way.

5         Why is this reasonable, Your Honor?  Again, it does

6    capture the seriousness of the offense and its duration.

7    This went on for a five-year period of time.  It reflects

8    the number of laws that were broken here, the integrity of

9    our system that has been thwarted, and also the dangers of

10   this human smuggling.  Putting the money into this system is

11   certainly encouraging and facilitating a very predatory

12   system that brings people into the United States.

13        And Mr. Evans, as essentially one of the owners of

14   the farm here, he is somewhat responsible for the crops that

15   are produced.  And the crops that came out of these things

16   that were set in motion were this control and this

17   exploitation, and you do have some ripple effects here, Your

18   Honor.  I don't know that we can get our arms around all of

19   them, but the Court can see how a lot of those victims or a

20   lot of the workers who went in and provided false

21   identification had Social Security numbers.  Those Social

22   Security numbers belonged to real people.  If W-2s or W-4s

23   were filed for them, if there was paperwork filed, that at

24   some point can come back to those true individuals that had

25   their Social Security numbers taken.  Again, it also does

1    support this trafficking of individuals into the United

2    States.  That's a systemic harm.

3            Now, Your Honor, those are the facts of the case,

4    and that's the nature and circumstances of the offense, both

5    as a whole and the defendant's own participation.

6            And now I would like to talk about his background.

7    When we look at background, Your Honor, we tend to go first

8    to criminal history.  Well, that's easy here.  Mr. Evans has

9    no criminal history.  That tends to show us what's going to

10   happen in the future.

11           Here, Mr. Evans, everything he has in his

12   background is good things, a family, education, work

13   history.  And we tend to look at a good background and a

14   good past as mitigating.  I do submit to the Court that that

15   should be somewhat more balanced in a case like this because

16   it ups the quotient of he should have known better.  He

17   really should have, Your Honor.  He was educated.  He was

18   intelligent.  He was experienced in business.  We're not

19   talking about somebody who is new to running a company or

20   new to engaging in this.  Mr. Evans is an experienced,

21   educated man.

22           So when you have that good background -- and

23   unfortunately, when we see these more sophisticated

24   white-collar type crimes, it is often individuals who are

25   caught up in this that have that type of background because

1    they're able to rise to the position of prominence to do it.

2         Mr. Evans didn't have to do this.  Looking at his

3    financial history, looking at what he has, he could have

4    retired.  He could have let this go.  There was no reason to

5    continue this.

6         So I would submit that, unfortunately, when

7    somebody has such a good background, it is a little bit

8    aggravating when they step away from that, when they walk

9    away, because to whom much is given, much is expected, Your

10   Honor.  And Mr. Evans had so many advantages, that he would

11   turn and disadvantage others in this way is somewhat

12   distressing and it is serious.

13        Again, Mr. Evans did not stop this on his own but

14   when he was arrested.  And he has certainly visited a

15   hardship on himself and his family, unfortunately, based on

16   the choices that he has made.

17        Your Honor, looking at the other purposes of the

18   sentencing here, I go to respect for the law.  I hope that

19   Mr. Evans realizes this, based on the testimony we heard

20   this morning and the expressions of remorse.  From what was

21   in the position paper, it seemed to be a lot of "he failed

22   to recognize" or "he failed to understand."  And I don't

23   think that that fits the statement of facts that he agreed

24   to.

25        The expression that he is "totally shocked" or

1    "surprised" by some of this has somewhat of a Casa Blanca
2    type air to it.  Again, Mr. Evans is not sitting across town
3    or across country.  He is at the business.  He's involved in
4    the hiring.  He's making payments to these individuals.  It
5    seems to me that there were a number of yellow lights that
6    he went through at best.
7         It is a serious offense, Your Honor.  I discussed
8    that at length.
9         We talk about deterrence.  I hope that Mr. Evans
10   doesn't need to be specifically deterred now that he's been
11   caught up in this.  I really don't think he does.  But I do
12   think general deterrence is very important in this case.
13   These labor trafficking investigations are more common than
14   they are prosecuted.  They are hard to identify.  They are
15   hard to investigate because a lot of times victims don't
16   come forward, and that was certainly the case with this
17   situation, Your Honor.  We didn't have victims come forward
18   until 2021, I believe, and then there was a lengthy
19   investigation where we tried to find out other victims.  And
20   the Court can kind of see that as workers come in and
21   workers leave, it is difficult for us to be able to find
22   those and to really get our arms wrapped around it.
23        In terms of just punishment, certainly Mr. Evans
24   should be justly punished.  This was not a one-time crime or
25   even a one-time call that Mr. Evans made.  This occurred

1    over a period of time for five years.  And a sentence at the
2    low end of that range as a starting off point does reflect
3    the charges, the role that he played, and just punishment.
4           And lastly, Your Honor, let me just talk a little
5    bit more about the victims.  We've submitted a number of
6    statements that the Court has seen.  These victims are
7    victims in a number of ways.  They are vulnerable people
8    that are brought into the United States.  They are coming
9    here hoping for something better.  The transportation
10   process can be difficult for them.  They're not coming here
11   under their own power necessarily.  They're being
12   transported here, and it's transported in a system that is
13   rife with problems.
14          Some of them were brought in.  M.M.G. provided in
15   her statement that she worked very long hours, there was no
16   air conditioning, no heat, only one 30-minute break.  And
17   just some of these working conditions couldn't be not
18   noticed by the defendant, and the long hours that these
19   folks are working.
20          You see how they check the boxes about their
21   feelings, whether they were angry or fear or concerned.  And
22   Mr. Evans played a role in setting the stage for this system
23   that exploited these people in this way.  So I think it's
24   important for the Court to consider the victims and remember
25   that these are the victims that we know of.  This is kind of

 1    the tip of the iceberg from the last year of this.
 2    Certainly, there were others.
 3            Your Honor, I'll just end with the observation that
 4    we're here because of the choices that Mr. Evans made.
 5    People don't just stumble into a conspiracy or get caught up
 6    in a wave of it.  He knew about this, and he decided to
 7    continue it, and we know that because of the length of the
 8    time that he was involved and the things that we can point
 9    to that show his involvement.
10            Your Honor, I will be happy to address our request
11    for a variance at the appropriate time, but at this point we
12    would ask the Court to consider as a starting point the low
13    end of that advisory range, which we think appropriately
14    reflects the 3553(a) factors.
15            THE COURT:  All right.  I do.  Let me just ask you
16    a couple of questions.
17            MR. SAMUELS:  Yes, ma'am.
18            THE COURT:  Can you explain to me again how the
19    money judgment amount was determined?
20            MR. SAMUELS:  Yes, ma'am.  And I might have to look
21    to my colleagues for a little bit of help here, but my
22    understanding is that how we determined the monetary
23    judgment was we looked at the gross revenue of Magnolia for
24    the period of time of the conspiracy, and that was about
25    $9 million, and then we took about 40 percent based on kind

```
1    of a conservative view, that that was the percentage of the
2    workforce that was illegal, and we applied that percentage.
3    After consulting with defense counsel and everybody coming
4    to an agreement that that was appropriate, we viewed that as
5    reasonable, and that came to about our $3.9 million figure.
6    And I see nods over at the government's table, so I think I
7    have hit most of it, Your Honor.
8              THE COURT:  All right.  And then somewhat related
9    to that, certainly Mr. Evans earned a salary during this
10   period of time.
11             MR. SAMUELS:  He did.
12             THE COURT:  But I think you would agree that he
13   didn't gain a windfall through his participation, that his
14   salary was consistent with what it would have been apart
15   from this offense.  And I just want to be clear, is that
16   your view, or is it that there was?
17             MR. SAMUELS:  I think that's right, Your Honor, but
18   I think that it came to the point where this was the
19   mechanism by which they were able to keep operating when
20   they had difficulty.  So, but for being able to engage in
21   this conduct to keep the business running, there is
22   certainly I think a profit motive tied up in that.  But I
23   would agree with the Court that if it had been running
24   legitimately there would have been some sort of salary, but
25   they needed to do this to keep it running.
```

```
 1              THE COURT:  All right.  Then do you have a position
 2    on whether I should impose a fine and the amount of that
 3    fine?
 4              MR. SAMUELS:  I defer to the Court, Your Honor.
 5              THE COURT:  All right.  And what about a term of
 6    supervised release?
 7              MR. SAMUELS:  Yes, Your Honor.  We would ask for a
 8    term of supervised release in this case.  I don't know that
 9    a lengthy term is appropriate, but I think there should be a
10    term of supervision.
11              THE COURT:  All right.  Very well.
12              MR. SAMUELS:  Thank you, Judge.
13              THE COURT:  Thank you.
14              Mr. Weisberg.
15              MR. WEISBERG:  Thank you, Your Honor.
16              May it please the Court.
17              Mr. Evans in no way is seeking, nor are the
18    pre-filings with the Court seeking to do anything other than
19    illustrate exactly what he did that was wrong and delineate
20    that from his co-defendants, which was some of it was the
21    same conduct and some of it was far different.
22              He fully and completely accepts responsibility for
23    the sad reality for which he is humiliated, that he in
24    2019 -- I'm sorry, 2021 agreed with his co-conspirators to
25    actively send money to El Salvador to smuggle three
```

1    individuals to the United States to gain employment

2    illegally at Magnolia laundering.  Those individuals, Your

3    Honor, are F.T.A., I.E.L.A., and O.A.A.G., as identified in

4    the statement of facts.  Those three individuals are all

5    adults.  None of those three individuals had minor children

6    with them.  And he does not in any way deny that that was

7    illegal.  He takes full responsibility for it.  And as we

8    put in our sentencing papers, his explanation for it is

9    lacking, but essentially, he was completely exhausted and

10   beaten by a failing company.

11          As the government has conceded, I think in the last

12   comments to the Court, in response to the Court's questions,

13   did he get windfalls?  No, he didn't get windfalls.  He was

14   barely surviving.  What probably needed to happen to this

15   company is what kind of did happen, which is it folded.  Now

16   it actually ended up selling, but it is not the same entity

17   it was when Mr. Evans was there.

18          In addition to that, 2017 and beyond is the offense

19   conduct that the government attributes to our client.  There

20   is no question that our client engaged in illicit conduct

21   during that period.  Our client received false and

22   fraudulent papers that supposedly authorized individuals to

23   work in the United States that were not authorized in the

24   United States.  He was aware that this was happening.  He

25   does not deny that he was aware that it was happening.

1          The point of our position paper, which is hard to
2    sort of nail down and define maybe as intricately as we
3    would like, is that the laws surrounding that issue, that
4    particular issue, are very complex for an individual to
5    navigate successfully on their own without getting in
6    trouble with the law.
7          We pointed out in our sentencing paper 8 U.S.C.
8    1324(b), which essentially says when a perspective employer
9    receives documents that on their face appear to be valid,
10   you essentially can't scrutinize them.  You cannot question
11   them without running afoul of punishment from the United
12   States government.  So if somebody gives you the very same
13   documents, arguably, that our client got in this case, you
14   can't -- and they look valid, that's the end of your
15   inquiry.  You submit it to your payroll company, as he did
16   here, and you hope that the government tells you that you're
17   not supposed to employ them, and then you can go from there.
18   Alternatively, you end up, if you do employ them, you end up
19   where our client is today, or you could end up under 8
20   U.S.C. 1324, which is a misdemeanor punishable by a maximum
21   of six months of incarceration.
22          It is a difficult area to navigate, and he knew
23   that he was not navigating it properly because he got the
24   notifications, and the government does have the proof to
25   establish it, and he's not denying it.  He's taking full

1    responsibility.

2           What probably should have happened is he should

3    have gone to an employment lawyer and gone to a criminal

4    lawyer and said, "What do I do here?"  And they would have

5    cleaned house and told him how to do it, and he wouldn't be

6    here today, and he should have, and he didn't, and he is

7    taking responsibility for that.

8           There are essentially two areas of conduct that are

9    in some ways very different and, of course, they're

10   foreseeable, and they're connected, and they're considered

11   related that really apply to this case that he absolutely

12   accepts responsibility for.  There are other areas that he

13   does not accept responsibility for, and I do not believe

14   that it is the government's position that he should have to

15   today.  And I really want to explore and clarify that, and

16   it sounds from the proceedings thus far that the Court has

17   delved into this somewhat.

18          The first thing I want to point out is that in the

19   statement of facts that's filed with the Court, which is

20   Document 56, the opening, the introductory paragraph says,

21   "By signing below, the parties stipulate that at trial, the

22   United States would have proven the following facts beyond a

23   reasonable doubt with admissible and credible evidence."

24   That's the introductory paragraph.

25          On page 2, under paragraph 6(b), essentially, "With

respect to Count One, the defendant knowingly and willfully combined, conspired, and agreed; (b) to commit one or more of the following offenses; that is," and then there is a list of what follows.

The reason I am bringing that to the Court's attention is because that language, those two clauses were expressly negotiated over. It was a point that we addressed to say we are not signing up for all of the conduct that the co-defendants conspired and did, in fact, commit.

The government has essentially acknowledged somewhat today that they acknowledge, and everybody agrees that our client had no knowledge -- excuse me -- our client had no direct threats of violence, no violence to these individuals whatsoever, and they have no proof to establish it, because he didn't.

They suggest -- and this is the area of contention -- that he should have known, but they offer no evidence despite -- excuse me -- aside from his ownership of the company and the fact that he's a hands-on employee of the company to suggest that he did know, so should have known, maybe.

Now, the conditions they point to, children living there. Well, it's not illegal to have a child working there in and of itself, *per se*, nothing illegal from what they presented to the Court thus far. A child, the child that

1    was working there was, by the facts, 14 years or older.

2    Under Virginia law you can work at 14 years.

3            There is no evidence to suggest that any of these

4    individuals came forward to our client and said, Mr. Evans,

5    we're in this terrible position.  Can you help us?  Your

6    partner and his wife are monsters.  That's not before the

7    Court.  That evidence isn't here.

8            There is no evidence that there was bruises.  There

9    was no evidence that there are instruments such as these

10   other cases that we presented to the Court where people are

11   chained, or they have security measures in the buildings

12   where they can't leave.  That's not a part of this case.

13           In fact, it's also not a part of this case that any

14   of the individuals that actually came here, all of them,

15   that any of them did not actually want to come here, saving

16   apparently one.  There was one minor child who ultimately

17   sounds like she wanted to come, but she wanted to come

18   because she wanted a job here and a place to stay.  Well,

19   that is what she got.  It was just more work than she should

20   have ever had to suffer through and more than she wanted.

21   But ultimately all of the individuals that came here, who

22   have been identified by the government, wanted to come here.

23           Now, the threats that were made to keep them here,

24   the monetary payments that really effectively operated to

25   trap them here, there is no evidence to suggest our client

1    had any role in that.  Is it a foreseeable part of a

2    conspiracy?  Yes.  We've acknowledged that.  We legally

3    admitted that because it is.  But was it factually?  No.

4    And there is no evidence to support that it was.

5            So what did he do?  He knowingly operated a company

6    that, as the government correctly pointed out, enabled this

7    to happen, and that's not okay.

8            THE COURT:  Well, Mr. Weisberg, I mean, I accept

9    the government's statement that they cannot prove that he

10   knew that this was occurring, but certainly there is some

11   evidence that he knew or should have known, such as the fact

12   that he was working there.  You in your position state that

13   he was working extremely long hours in 2021, that he was

14   there six days a week, that during that period of time a

15   14-year old was working at the business, that even if she

16   was believed to be 17, she was also in school.  So

17   certainly, you would see this child working.  You would know

18   the fact that they're supposed to be in school.  So I have

19   to say I don't think there is no evidence.  I think I have

20   to accept the government's representation that they cannot

21   sufficiently prove knowledge, but there is -- I have to

22   consider the circumstances of what's presented and his

23   involvement, and so I think the statement of no evidence is

24   not reflective of what's in the Presentence Report.

25           MR. WEISBERG:  But the no evidence I'm referring to

1    is not that, Your Honor.  I acknowledge that he did know

2    that she was working there.  I acknowledge that he knows the

3    amount of hours and knew that she was of school age, but

4    none of that is illegal in and of itself.

5            And what I am saying he did not have knowledge of

6    is, he did not have any knowledge whatsoever that this

7    person may have been subject to threats in the Landaverde

8    household, and they have no evidence to suggest he did, so.

9            And yes, Your Honor's point is well taken.  Should

10   he have taken that person and said, well, let me look at

11   these documents?  Should this girl be working here this

12   much?  Is all of this legit?  I know I had problems before.

13           Yes.  If that's Your Honor's point, I agree, and

14   I'm not trying to argue that point.  My point is that this

15   same girl that's there is never coming to him and saying,

16   they are threatening me, my siblings are threatening me.

17   This same person is not saying anything about, you know,

18   financial loans or entrapment of that regard.  This person,

19   at worst, is working side by side with our client who is in

20   the exact same environment that these people are working in.

21           So as opposed to, you know, a case that could be

22   charged under this where somebody has been smuggled here and

23   trapped, such as the restaurant workers in the cases we

24   cited, and the owners are lording over them, something like

25   medieval times.  That's not what this is.  This is a person

1    working in the exact same environment with people he thinks

2    are just as willingly working there as he is.  I mean, this

3    isn't where he wants to spend his 60s either, or any time,

4    but this is the job that was available to him, and this is

5    what he was doing.  Likewise, it was fair for him to assume

6    essentially, with the exception of that young girl, that

7    that's what we have here.  They had no evidence to suggest

8    that any of these other individuals, that he had knowledge

9    of that, other than he's an owner writing paychecks.  That's

10   the point that I am trying to make.

11              THE COURT:  All right.

12              MR. WEISBERG:  Your Honor, so when we get to the

13   point of what he really did know, and I just submit to the

14   Court when the Court is trying to come up with an

15   appropriate punishment for that, that offense conduct of

16   employing people knowing that they're illegal is a

17   misdemeanor.  It can be punished under federal law as a

18   misdemeanor, and the maximum punishment is six months in

19   jail for all of the conduct involved in that.  That's one

20   class of his conduct that he is before the Court on.  The

21   other class is the 2021 conduct, where those three

22   individuals come, and I think I've already made the factual

23   distinction with respect to them about who they were and who

24   they weren't.  These were people that wanted to come here.

25   One of these people left within months of being here.

1    Again, no reason for my client to think that that man was

2    being subject to threats whatsoever, no evidence to suggest

3    that anybody ever told our client that that was going on.

4         Your Honor, I want to turn next, if I may, to the

5    relative culpability of the individuals here.  The

6    government has asserted that my client is sort of the second

7    least culpable person, submitting that Mr. Reyes is the

8    least culpable.  There were 21 false Social Security cards

9    found in his possession when they --

10        THE COURT:  I'll just say, because I did say this

11   during the co-defendant's sentencing, that while he is a

12   member of the conspiracy, his conduct is so different than

13   that of the other three co-defendants that, to me, it's very

14   difficult to compare those individuals to Mr. Jeronimo-Sis.

15   His conduct is just so different that, to me, I do need to

16   consider sentencing disparities, but I frankly just see them

17   as almost different situations that are difficult to compare

18   to each other.

19        MR. WEISBERG:  Understood, Your Honor.  And, you

20   know, the only thing I would submit with respect to

21   Mr. Jeronimo-Sis is that there are 26 people or 26

22   identities that he has in his possession that are false.

23   That's potentially 26 individuals who could have been put in

24   the exact same position that the individuals in this case

25   were put in.  And more importantly and perhaps most

1    importantly in this case, the one thing that my client was

2    doing right in this case is that he was making it so that

3    but for the Mr. Jeronimo-Sis's of the world, people making

4    these false documents, you wouldn't have gotten a job at

5    Magnolia.  You could not get a job at Magnolia.

6        The controlled call that the government has cited

7    in their statement of facts makes it clear that you do not

8    work here without papers.  Now it also, yes, I understand,

9    says -- is him basically acknowledging that he knows that

10   he's getting papers that aren't good.

11       But without Mr. Jeronimo-Sis, my client is not here

12   either.  And these people that came here aren't here by

13   virtue of his paperwork, and they're not at Magnolia laundry

14   by virtue of his paperwork.  So that's 26 people that he has

15   a criminal enterprise.  That's the focus of his enterprise.

16   My client's enterprise is to clean laundry and run a lawful

17   business.  His enterprise was to make false documents to

18   facilitate the trafficking of individuals to this country to

19   work, when they're not allowed to work, which makes it much

20   harder for the government to control the trafficking in the

21   first place.  So I would just submit that.

22       With respect to Landaverde and Vaughan, they

23   represent the pure and true evil that is associated with

24   trafficking, and there is just no question about that.  And

25   there is also absolutely no evidence, I would submit,

1  to suggest that my client had any knowledge about it, and I

2  stand firm on that.  And by my negotiations with the

3  government on the statement of facts, I think I am allowed

4  to do that.

5          Do I think that he could have been wiser about what

6  is before him, and how he is operating his business, and who

7  is working there?  Yes, he could have been wiser.  And he's

8  bearing a responsibility for that today.

9          But I strenuously object to the notion that he

10  turned a blind eye to people suffering from physical threats

11  or anything like what occurred apparently in the household,

12  and I stress the household of Landaverde and Vaughan.

13          And I also stress that, yes, my client was

14  primarily working day shift, and these were effectively

15  ships passing in the night.  These individuals, the owners

16  of this company, were not having, you know, business

17  meetings and weekly meetings or daily meetings.  They were

18  really operating in their own lane, in their own world, and

19  ships in the night, sort of swapping keys, if you will, here

20  you go, the business is yours for the next shift.  So I

21  don't think there is any evidence to the contrary with

22  respect to that.

23          Your Honor, when we do look at the guidelines as a

24  recommendation in this case, we are glad and grateful for

25  *Booker*.  We're glad they're advisory.  We agree that they're

1    correctly calculated as they're required to be, but we also

2    believe that that demonstrates that they are problematic.

3    You have a six-point enhancement for the 25 to 99 aliens.

4    You have a four-point enhancement for the unaccompanied

5    minor.  And you have two levels for the vulnerable victims.

6    For all of those individuals, for the reasons I've already

7    submitted, those mostly apply to the co-defendants.

8         I am not saying my client is without fault.  I

9    think I have established that.  But he did not play as

10   direct and knowing role in the fashioning of the treatment

11   of those individuals reflected in those enhancements, so it

12   is submitted that the guidelines, as they pertain to

13   Mr. Evans, really overstress and overemphasize the

14   accountability that he should suffer for that.

15        Your Honor, his daughters, I think have made clear

16   through their letters and made clear through their testimony

17   today that Mr. Evans is not a cruel human being.  He was a

18   proud successful member of the business community.  He is a

19   proud father.  That makes his humiliation and his own

20   failures that bring him before the Court today that much

21   more painful.

22        The government is right, specific deterrence is

23   just not necessary in a case like this, and I would submit

24   that the fact that he has no prior record, the fact that he

25   has led such a productive and successful life and committed

1    to a life almost entirely without running afoul of the law

2    is something that he should be given credit for.  It does

3    indicate that specific deterrence isn't necessary.

4            Also, I would submit to the Court in terms of

5    general deterrence, I would suggest that it's not a bad

6    message for people to understand that, yes, you do suffer

7    consequence no matter when in life that you commit a crime,

8    that's the answer that you come to have to give in this

9    life.  You're never above the law.  You're never beyond the

10   law.  But it's not a bad thing if you spend 99 percent of

11   your life abiding by it.  That's a good thing, and you

12   shouldn't be punished more for that.  You should be given

13   credit for that, to a degree.

14           I think it also supports the position advanced in

15   our papers and also by his daughters that this was a man

16   that was exhausted.  This is a man that got beaten by the

17   business and wasn't operating with his best judgment.  It

18   was a man that found how to navigate the immigration and

19   employment laws surrounding this business al dita.  He was

20   just out of his depth on it.  And contrary to the

21   government's position, that's not that unbelievable.  You're

22   a CFO.  That's not human resources.  He's a CFO.  That's

23   something that he never had to deal with before.  And there

24   are no easy answers if you really start looking at the law

25   on how a United States lawful businessman is supposed to

1    really handle that issue.  That's not on the websites.

2    There is no fact question on:  What do you do?  They're just

3    telling you what you can't do.  There is not an easy answer

4    there.  We don't have one.  And I haven't had the government

5    tell us what there was other than essentially to shut it

6    down.

7          This is, no doubt, going to be Mr. Evans's last

8    time ever before Your Honor or before a court regarding a

9    criminal conduct.  He has led an exemplary life.  He has

10    raised exemplary daughters.  He serves as an example as to

11    how you should treat a spouse, even your ex-spouse, when

12    they are ill.  This a good man who had a lapse of judgment.

13          Thank you.

14          THE COURT:  Thank you.

15          MR. SAMUELS:  Your Honor, may I just say a few

16    things?

17          THE COURT:  You can.  And I do also think that it

18    probably would be most appropriate to first, after you

19    speak, to then hear any argument on your motion and then

20    allow Mr. Evans to allocute.

21          Any issue with proceeding in that way?

22          MR. SAMUELS:  No, ma'am.

23          THE COURT:  All right.  Go ahead.

24          MR. SAMUELS:  Your Honor, I just wanted to

25    reference three pieces on this kind of point of knowledge

 1    and participation, and I am going to take them directly from

 2    the PSR.

 3              In the PSR, paragraph 17, August 7th, 2019, the

 4    defendant caused a transfer of approximately $16,395 from

 5    the account, the funds from the business account.  The funds

 6    from that monetary transaction were criminally derived

 7    property.  They were derived from this encouraging, this

 8    transporting, this trafficking.

 9              This idea that the defendant maybe committed this

10    misdemeanor violation because he didn't check the documents

11    enough, that's not a specified unlawful activity for a money

12    laundering count.  So in terms of the knowledge, the

13    defendant knows that this money is unlawful and it's being

14    generated in this process.

15              And again, I come back to my kind of metaphor of

16    the pot getting warmer and warmer.  By the time the minor

17    starts working there, and this is in 2019, Your Honor, the

18    defendant has processed a bunch of checks to people that he

19    knew were not authorized to work at the business, knew were

20    not authorized to work in the United States.

21              So we see in paragraph 41 there begin a series of

22    checks to M.G.M.  M.G.M. was actually 13-years old.

23              So what do you have, Your Honor?  You have got a

24    13-year-old girl that's working in this business for long

25    periods of time.  The defendant is writing checks to her,

1    admitting that he knows -- there was some statement here, I
2    thought, that, well, a 14-year old could work there.  But
3    no, the defendant has admitted that he knows she's not
4    authorized to work in the United States.
5            So wouldn't a responsible business owner making
6    payments to this young girl, who he knows is not authorized
7    to work in the United States, as he has known a lot of other
8    folks are not authorized to work in the United States,
9    wouldn't that raise questions for him, concerns for him?
10   Isn't that a very alarming red flag?
11           And one of the checks was rewritten the next day
12   because the first check was to the wrong name.  So he even
13   knows she's using a different name.
14           And then lastly, Your Honor, paragraph 51 of the
15   PSR, between 2019 and 2022, Aragon Landaverde, Vaughan, the
16   defendant, and Magnolia provided their clients with U.S.
17   currency and directed them to wire funds to Central America
18   to pay for nationals to illegally come to the United States.
19   So there is this knowledge and involvement that I do think
20   does raise the specter of what is really occurring here, and
21   I wanted to respond to that, Your Honor.
22           THE COURT:  Very well.
23           MR. SAMUELS:  Thank you, Judge.
24           THE COURT:  Regarding your motion for a variance.
25           MR. SAMUELS:  Yes, Your Honor.

1           THE COURT:  I do think you have set forth your
2    reasoning very well in your motion.
3           MR. SAMUELS:  Thank you.
4           THE COURT:  Do you think that there are other
5    things that you need to raise with me, other than what's
6    already presented in the motion?
7           MR. SAMUELS:  I do not, Your Honor.
8           THE COURT:  I think that encapsulates it well.
9           THE COURT:  Very well.
10           Mr. Weisberg, I can't recall whether you
11    specifically responded to the motion made by the government,
12    and so if you wanted to speak on that specifically, I would
13    do a sidebar for that, but if you feel that that's not
14    necessary, then we won't.
15           MR. WEISBERG:  I believe it is necessary and we
16    would make the request.
17           THE COURT:  All right.  Then why don't counsel come
18    forward.
19           Mr. Weisberg, are you asking that your client come
20    forward as well?
21           MR. WEISBERG:  He doesn't need to, Judge.
22           THE COURT:  All right.
23           (Sidebar conference redacted by order of the
24    Court.)
25    ██████████████████████████████████████████████

JILL H. TRAIL, Official Court Reporter





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16    (Sidebar concluded.)

17    THE COURT:  So, Mr. Evans, could you please

18    approach with your counsel.

19    Mr. Evans, I have heard from the attorneys and read

20    their position papers, read the letters in support and heard

21    from your daughters.  You also have the right to speak

22    before I impose any sentence.  You don't have to do so, but

23    if you would like to say something, I would be happy to hear

24    from you now.

25    THE DEFENDANT:  Thank you, Your Honor.  I

1    appreciate the opportunity.

2            I acknowledge and accept the crimes that I have

3    been accused of and have admitted to in my pleading

4    agreement.  I made numerous mistakes of judgment in giving

5    to the decisions that I made leading up to this and

6    sincerely regret this.  During much of the time leading up

7    to this I was working as much as 80 hours a week and

8    commuting back and forth to Richmond, where I lived, on top

9    of that, and I was exhausted, overwhelmed, and that clouded

10   my judgment, and that led me to make bad decisions.

11           Prior to my being involved with the laundry in

12   Williamsburg, I was CFO of a public company that owned a

13   number of insurance companies, and that put me under the

14   constant scrutiny of the Securities and Exchange Commission

15   and various insurance departments, and I never had any

16   issues with that.

17           I also deeply regret any harm that came to any of

18   the employees, even though there was nothing I did directly

19   to threaten or harm them.  I also regret the shame and

20   embarrassment that this has brought on my family.

21           And I ask for whatever leniency the Court might

22   give me and respectfully accept whatever decision the Court

23   makes.

24           Thank you, Your Honor.

25           THE COURT:  Thank you, Mr. Evans.  Sir, just give

1  me one moment.

2         So, Mr. Evans, what I have to do at sentencing, and

3  what Congress tells me I have to do, is to consider these

4  different factors that are set forth in the statute that

5  represent all of the different things that courts should

6  consider when imposing sentence, such as the offense, the

7  seriousness of the offense, the person standing before me,

8  the need to deter future similar conduct, the need to

9  promote respect for the law.  And that's in some ways like

10 making soup, in that you have to consider each one of those

11 factors and try to find a sentence that I think is

12 appropriate, but not greater than necessary, to meet those

13 factors.  And so let me walk you through my thinking as to

14 each of those factors and how I arrive at the sentence that

15 I arrive at.

16         I do have to consider the nature and the

17 circumstances of your criminal conduct.  And here the

18 Presentence Report describes it.  It is extensively

19 described.  I do think that there are a number of

20 aggravating factors relating to the offense itself, and here

21 the offense is, you know, effectively the conspiracy to

22 induce and recruit foreign nationals to come to the United

23 States and work and to engage in illegal employment for --

24 really, it is for the financial benefit of your company,

25 although I do recognize that financially the company may

1    have been struggling.

2         This conspiracy, I also have to consider your

3    specific role in that.  I have to consider the fact that you

4    were an owner of the business.  You were substantially

5    involved in the day-to-day running and operation of the

6    business.  It is I think fairly important to consider the

7    duration of the conspiracy because humans have lapses in

8    judgment.  We make mistakes.  It is common.  When it occurs

9    over a longer period of time, it becomes more significant.

10   So here the length of the conspiracy, to me, is an

11   aggravating factor.

12        I think the fact that part of the conspiracy was to

13   secure foreign nationals with illegal documents, it is also

14   aggravating.  I have to consider the number of foreign

15   nationals involved.

16        I do recognize your attorney's argument, and it is

17   very clear that you yourself did not inflict any abuse.  You

18   made no threats.  You didn't direct that, and that's all

19   very clear.  Frankly, your knowledge, which is nearly

20   impossible to know -- I have to take what I have, which is

21   that there is no direct evidence of your knowledge that

22   these threats were occurring.  And I think your attorney

23   makes a good point that even if there was some knowledge

24   about coerciveness within the business, certainly there was

25   no specific knowledge about the specific threats or the

1   specific assaults done in the case, and so I accept that,

2   and I think your sentence reflects that.

3          But I also have to consider that as a result of

4   this conspiracy a 13-, 14-year-old child was employed, that

5   she worked exceedingly long hours while attending school,

6   that the conditions in the business were poor, that there

7   were individuals living in the business, that an infant was

8   left in a baby seat for hours on end.

9          And so even, even if I accept your position

10  regarding knowledge, I still have to consider the effect

11  that this conspiracy had on real people and their lives, and

12  it is -- really, it's reprehensible what happened to these

13  people, and I have to consider that, and I do think it's

14  aggravating.

15         There are also mitigating facts relating to the

16  offense conduct.  I do very strongly weigh the fact that

17  these individuals, while working illegally, were paid a fair

18  wage, that they were paid what they should have been paid,

19  and that they were paid overtime, which often doesn't even

20  happen, and so that does, to me, indicate a desire to comply

21  with the law as well as to treat employees fairly, at least

22  as it relates to their employment.

23         I recognize that this business was run for some

24  period of time without engaging in this conduct which,

25  again, I think supports your argument that you acted out of

1    desperation or made decisions out of desperation.

2         I also consider the degree to which you profited

3    from this scheme.  I think you certainly did not, in my

4    mind, unfairly profit.  It was illegal.  Your salary was to

5    some degree derived from that illegal conduct, but it was

6    likely the salary that you would have received, that you

7    weren't essentially getting rich from this conspiracy.

8         And as I think all the parties have recognized,

9    your involvement was significantly different than that of

10   your co-defendants, and that I have to also weigh heavily.

11        I do also have to consider your history and

12   characteristics, and it is accurate that nearly everything

13   in your history is mitigating.  You have no criminal

14   history.  You are 68-years old, and you've lived as a

15   productive citizen.  You're educated.  You were employed.

16   You were successful.  You raised a family.  The fact that

17   you're still supporting your wife, although you're

18   separated, to me speaks to your character which, again, I

19   think is very positive.

20        I do consider your past employment, because you

21   were a sophisticated businessperson, and I consider that,

22   and clearly I think took steps to run this business

23   appropriately and legally, but there is to some degree that

24   you certainly knew that this was illegal, and that you

25   shouldn't have done it, and it was breaking the law.  And so

1    that, I think it just cuts both ways.

2         I do have to also consider the need for deterrence,

3    and that is to deter you specifically but also to deter

4    others.  I agree that given your age and your background

5    that there really is very little need to specifically deter

6    you.  I think you have been deterred through the conviction,

7    through the financial penalties, through just the processing

8    of your case, that you are highly unlikely to engage in any

9    additional conduct in the future.

10        But I also have to consider general deterrence, and

11   I do think that that is important in this case because, you

12   know, I recognize, and you can read the newspaper, there can

13   be labor shortages, have been and likely still are in this

14   country, and that may be driven, in part, by the immigration

15   policies and law, but the law is the law, and to step

16   outside of those bounds and to not follow the law, at that

17   point, you know, our country isn't what it really is, and so

18   there is a need to ensure deterrence in this case.

19        I do also have to consider the advisory guideline

20   range, and let me talk about that for just a moment.  Here

21   your advisory guideline range is 63 to 78 months, that's

22   about a little over five years to six and a half years.  And

23   the advisory guideline range is properly calculated, but I

24   do look at that range and note that -- and I think your

25   attorney had pointed this out -- that there are some

1    enhancements that are applied to which your involvement was

2    especially different than that of your co-defendants.

3         And so specifically the fact that one enhancement

4    is the fact that a minor was transported while being

5    unaccompanied, there is surely no evidence that you knew

6    that that was happening, that you were involved in that.

7    And so while it's appropriately applied, as it relates to

8    you, I kind of have to take some of that away because of

9    your specific role which was, as to that, really that you

10   were not specifically involved in that conduct.

11        And also, to some degree the fact that this

12   involved vulnerable victims, certainly I think you had

13   knowledge as to where these individuals were coming from,

14   but less knowledge than that of your co-defendants regarding

15   their specific circumstances.

16        So again, I consider the advisory guideline range,

17   but to some degree I think it overstates the specific

18   involvement that you had or your role in the offense.

19        I do also have to avoid unwarranted sentencing

20   disparities.  Your guidelines are somewhat similar to

21   Mr. Vaughan's, if not the same, less than Ms. Landaverde.  I

22   do think that their roles are significantly different than

23   yours, but given the government's motion, to some degree

24   that's accounted for, and so I recognize that you are

25   relatively less culpable than your co-defendants, but I

1    think I can reflect that fact in the sentence that I am

2    imposing.

3            I will grant the government's motion for a variance

4    for the reasons stated by the government in their motion.  I

5    accept their description of their reasons for the variance,

6    as well as your attorney's statements regarding future

7    impacts that certain activities may have, and so I have

8    considered that, and I will grant the government's motion in

9    the degree to which they have suggested.

10            But, sir, I will impose a term of incarceration in

11    your case, and I think that is necessary given the

12    seriousness of the offense, most specifically the

13    consequences and what occurred as part of the conspiracy,

14    the length of time that your involvement lasted, and the

15    need to deter others.  I do think a term of incarceration is

16    necessary.

17            I am not going to impose the sentence requested by

18    the government, in part, because I think that the advisory

19    guideline range to some degree overstates the reflection of

20    what happened here.  I have to consider their motion for a

21    variance, and so I have done that, but I do think some

22    further reduction is appropriate.

23            So based on all of that, Mr. Evans, it is the

24    judgment of the Court that you are committed to the custody

25    of the United States Bureau of Prisons for a term of

1    incarceration of 30 months on Count One, and 30 months on

2    Count Thirty-One, to be served concurrently, meaning at the

3    same time, for a total term of incarceration of 30 months.

4          I will recommend that you be assigned to a facility

5    as close as possible to your family in Virginia, but I would

6    note for you that that is just a recommendation that I make.

7    The Bureau of Prisons does not have to follow that

8    recommendation.

9          Following your term of incarceration, I will place

10   you on a term of supervised release of one year on Count One

11   and one year on Count Thirty-One, to be served concurrently,

12   for a total period of supervised release of one year.  My

13   reasoning there is that I just see very little need for a

14   term of supervised release, especially given your prior

15   compliance, your payment, for example, towards the judgment,

16   the fact that you've complied with pretrial release.  All of

17   that indicates to me that while some term of supervised

18   release is appropriate, that that length can be shorter than

19   may be normal.

20         You must, however, comply with the following

21   conditions while you're on supervised release:  That you not

22   commit another federal, state, or local offense.

23         I will waive the drug testing condition based on my

24   determination that you pose a low risk of future substance

25   abuse.

1          And you are prohibited from possessing a firearm,

2    ammunition, destructive device, or other weapon.

3          I have considered your assets, your net worth, your

4    age, your financial needs, your earning potential, and the

5    fact that a money judgment has already been entered in this

6    case, and I will not impose any additional fine given the

7    financial penalties that have already been assessed.  I find

8    that they adequately address the criminal conduct in this

9    case.

10          I am, however, required to impose a $200 special

11    assessment.  That is due and payable immediately, but if

12    it's not paid in full, it's to be paid 60 days after your

13    release in $25 increments per month until it's paid in full.

14          All right.  Mr. Samuels, are there any other

15    motions or any other documents that need to be addressed?

16          MR. SAMUELS:  I don't think so, Your Honor.  We do

17    need to move to dismiss the remaining counts of the

18    indictment against Mr. Evans.

19          THE COURT:  That motion is granted.

20          Anything else you think we need to address other

21    than his appellate rights?

22          MR. SAMUELS:  No, Your Honor.  Thank you.

23          THE COURT:  All right.

24          Mr. Weisberg, anything else you think I need to

25    address other than his appellate rights?

1          MR. WEISBERG:  Your Honor, we would just ask the

2    Court to consider allowing him to self-report.

3          THE COURT:  Yes, I will permit that.

4          And, sir, what I will do is that you're directed to

5    self-report no later than Tuesday, September 5th, 2023, by

6    12:00 o'clock.  What that means is if you receive

7    information from the United States Marshals to report to a

8    particular location, then you're to do that.  If, however,

9    you don't receive that communication by September 5th, then

10   you report here no later than noon.

11         Do you understand that?

12         THE DEFENDANT:  Report to this court no later than

13   noon?

14         THE COURT:  Yes, on September 5th, if you do not

15   receive other communications from the United States Marshals

16   regarding your location of self-reporting.

17         THE DEFENDANT:  Okay.  I understand.

18         THE COURT:  Between now and the time in which you

19   self-report, you do remain on the conditions of pretrial

20   release, which means the same conditions that the United

21   States Magistrate placed you on, they remain in place until

22   you self-report.  If you don't comply with those conditions,

23   or you don't report as directed, then you could face

24   additional penalties for that conduct.

25         Do you understand that?

1            THE DEFENDANT:  I do, Your Honor.

2            THE COURT:  All right.

3            Madam Clerk, do you know whether the marshals

4    typically have a designated place for him to report within

5    30 days, or do you think it takes longer?

6            THE CLERK:  I am not sure.

7            THE COURT:  Could you come forward, please.

8            I'm going to ask one of our U.S. Marshals a

9    question.

10            (Sidebar between Judge Hanes and U.S. Marshal.)

11            THE COURT:  Mr. Weisberg, my question to the United

12    States Marshal is that my preference really is that

13    Mr. Evans is able to report directly to the facility to

14    which he's been designated rather than coming here, given

15    the time and logistics of getting someone transported if

16    they actually report here.  The U.S. Marshal does indicate

17    that I think 30 days is adequate.  If, however, you received

18    information that that designation will not occur within the

19    30-day period, I would consider pushing the report date out

20    so as to accomplish that goal.

21            MR. WEISBERG:  Judge, we did some research on this

22    issue in advance of today.  In fact, Mr. Gorman looked into

23    this, and the information that we got is it could take two

24    to six weeks, is the information we got.  I would just bring

25    that to the Court's attention, if the Court would consider

1    that outside period.

2         THE COURT:  What I will do, I will then set it --

3    I'll add the additional 14 days, which would be

4    September 19th.

5         Madam Clerk, is that a weekday?

6         THE CLERK:  Yes.  It is a Tuesday.

7         THE COURT:  Sir, what I will do is I will change

8    your self-report date to September 19th by noon.

9         Other than that, Mr. Evans, I am not suggesting

10   that there is a reason to appeal, but if for any reason you

11   wish to appeal, you have to do so by filing a written notice

12   of appeal with the clerk of this court within 14 days from

13   today's date.  If you don't act in that way and in that

14   time, any right of appeal is lost forever.  Additionally,

15   part of your attorney's role would be to assist you in that

16   if you wish to do so.

17        Do you understand those things?

18        THE DEFENDANT:  Yes, I do, Your Honor.

19        THE COURT:  All right.  Mr. Evans, I do hope that

20   you stay well during your term of incarceration.  I'm sorry

21   to see you in this position because I do recognize that the

22   vast majority of your life has been spent in a way to help

23   other people, and to work, and to provide for your family,

24   so I do wish you well, and I hope your family stays well

25   during your time of incarceration as well.

1          THE DEFENDANT:  Thank you very much, Your Honor.

2          THE COURT:  Thank you all.  We will stand in

3    recess.

4          (Proceedings concluded at 12:17 p.m.)

5

6

7                        CERTIFICATION

8

9      I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12

13        _____/s/_____

14                   Jill H. Trail

15                September 25, 2023

16

17

18

19

20

21

22

23

24

25